**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 10-CR-0048-001-CVE |
| | ) | |
| **LARRY G. KOCH,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Now before the Court is Defendant Larry G. Koch's Motion for Judgment of Acquittal (Dkt. # 60). Koch and Sullivan Eric Johnson were charged in a two-count indictment (Dkt. # 2) with conspiracy to commit crimes against the United States in violation of 18 U.S.C. § 371, and willfully misapplying moneys intrusted in the care and custody of a federally insured banking institution in violation of 18 U.S.C. § 656. Count One of the indictment charged three objects of the conspiracy: to make false statements to a federally insured banking institution in violation of 18 U.S.C. § 1014; to execute a scheme or artifice to obtain moneys under the custody and control of a federally insured banking institution by means of false and fraudulent pretenses, representations, and promises in violation of 18 U.S.C. § 1344(2); and to commit theft and misapplication by a bank officer in violation of 18 U.S.C. § 656. Count Two charged a violation of 18 U.S.C. § 656. Johnson pled guilty to Count One of the indictment on May 25, 2010. Dkt. # 30. Koch's jury trial was held June 21-23, 2010. The jury found Koch guilty of conspiracy to execute a scheme or artifice to obtain moneys under the custody and control of a federally insured banking institution. Dkt. # 59, at 1-2. The jury found that the government had not proved the other two objects of the conspiracy beyond a reasonable doubt, and found Koch not guilty of Count Two. Id. Koch argues that the evidence

is insufficient to support his conviction because there was no evidence Koch knew about the false representations and because a check kite[1] is not unlawful under 18 U.S.C. § 1344(2).

**I.**

The charges against Koch arise out of a loan made in May 2000 by the Bank of Oklahoma (BOk) to Sullivan Eric Johnson to purchase from Brad Carson the Red Arrow Marina near Afton, Oklahoma. Carson died in October 2009 and was not charged with a crime.

Prior to May 2000, Carson and Johnson agreed to inflate the purchase price of the marina in order to provide working capital for Johnson to operate the marina. Dkt. # 55, at 14. The price agreed upon was $1,750,000. Carson and Johnson also discussed ways in which Johnson could come up with the $350,000 down payment to purchase the marina, because Johnson had told Carson that he did not have the money for a down payment. Dkt. # 55, at 20. Johnson and Carson created fraudulent documents to make it appear that Johnson owned stock in Autumn Home Care Facilities, Inc. (Autumn Home), a company of which Carson was the majority shareholder. In fact, Johnson never owned any shares of Autumn Home.

Koch was the vice president, corporate vice president, and market president at the BOk branch in Grove, Oklahoma. Dkt. # 57, at 13. Johnson and Carson approached Koch about BOk making Johnson a loan to purchase the marina. The loan was to be classified as for a startup business and required a Small Business Administration (SBA) guarantee. Dkt. # 57, at 20. BOk agreed to loan Johnson $1,400,000 to purchase the marina from Carson. As a condition of the loan,

---

[1] "Check kiting occurs when accounts are maintained in different banks and checks are drawn on one account and deposited in the other when neither account has any substantial funds in it to pay the checks drawn on it." United States v. Swanson, 360 F.3d 1155, 1159 n.1 (10th Cir. 2004) (quoting United States v. Cronic, 900 F.2d 1511, 1512 n.2 (10th Cir. 1990)).

Johnson was required to make a twenty percent down payment of $350,000. Originally, the down payment was to be made in Autumn Home stock. Shortly before the loan and purchase were scheduled to close, Koch informed Johnson and Carson that the SBA required that the down payment be made in cash. Johnson and Carson swapped checks to make it appear that the $350,000 down payment had been made, without any funds changing hands, as part of the following scheme: Johnson executed a fraudulent stock assignment purporting to transfer 50,000 shares of Autumn Home stock to Carson.[2] Pl.'s Ex. 8. On May 17, 2000, Carson wrote Johnson a check on his BOk checking account for $350,000. On May 18, 2000, Johnson deposited the check in a newly-opened bank account at the First National Bank of Grove, Oklahoma. When the president of the First National Bank expressed concern about the check from Carson to Johnson, Koch caused BOk to issue an official check to cover Carson's personal check. The loan and purchase of the marina closed later on May 18, with Johnson writing a $350,000 check on his First National Bank account for the down payment. Johnson never made a payment on the loan.

Johnson initially met with Koch regarding the loan in late 1999 or early 2000. Johnson testified that Koch was never told that the Autumn Home stock subscription agreement was false, that Johnson did not own Autumn Home stock, or that Johnson's personal financial statement was false. Dkt. # 55, at 20-21; 32.

Johnson testified that, at around 1:00 p.m. on May 17, 2000, Koch called Johnson and Carson to tell them that the SBA would not guarantee the loan if the down payment were made by a stock transfer, and that the SBA required a cash injection. Dkt. # 55, at 40. Johnson testified that he responded to both Koch and Carson "I don't have $350,000 cash to make this deal." Dkt. # 55,

---

[2]   The assignment was dated May 1, 2000 but signed May 17, 2000.

at 40-41. Koch confirmed that the deal would require a cash injection. Johnson testified that he again said he did not have $350,000 cash. Johnson testified that Carson said "I could loan you the money or swap checks." Johnson testified that he replied "I know what a check kite is and I didn't, you know, want to be in trouble over a hot check." Dkt. # 55, at 43. Johnson testified that Koch was party to this conversation, and didn't respond "a whole lot initially." Id. at 44.

Johnson testified that he was uneasy about the proposed check swap, but that Carson assured him it would work. When asked by counsel "Did [Koch] respond to Brad Carson's statement that these checks would cancel each other out?" Johnson responded "yes, he said that they would, that this would work. But he also said that if we did this, he didn't want to know anything about it." Johnson testified that "this" meant the check swap. Dkt. # 55, at 45. That afternoon, Carson wrote Johnson a check from his BOk checking account for $350,000. Pl.'s Ex. 16.

Johnson testified that, about an hour to an hour and a half later, Koch called Johnson and said "I've been talking to Brad [Carson] and he says you're very uncomfortable with this situation," and gave Johnson his home telephone number in case Johnson wanted to discuss it further. Dkt. # 55, at 47. Johnson testified that, at 5:00 or 5:30 a.m. on May 18, 2000, he called Koch's home and said "[y]ou know, Mr. Koch, I just have concern that, you know, I'm going to be writing a hot check, you know. Is there a guarantee or confirmation that this is electronically going to swap?" Johnson testified that Koch replied "[y]ou know Eric, if you don't want to do this, don't. I'm just telling you it'll work." Dkt. # 55, at 48.

At 8:00 or 8:30 a.m. on May 18, 2000, Johnson went to the First National Bank of Grove, Oklahoma to open a checking account. He deposited Carson's $350,000 check and $100. Dkt. # 55, at 50. Ed Hamilton, the president of the First National Bank, was concerned about the $350,000

check and called Koch to verify it. Johnson testified that Koch asked to speak to him. He testified that Koch asked him "what are you doing?" as if Johnson were doing something wrong by going to the First National Bank. Dkt. # 55, at 56. Johnson testified that Koch then said "everything will be all right." Id. Johnson left the First National Bank and drove to the BOk parking lot where he wrote a $350,000 check to Carson for the down payment. Dkt. # 55, at 57. Johnson testified that Koch did not know that the stock assignment was fraudulent or that Johnson did not own Autumn Home stock, but that "once we heard from him, from Mr. Koch that the stock assignment wasn't going to work for the cash injection, then he knew everything about the check swap." Dkt. # 55, at 63.

Hamilton remained uneasy about Carson's check and asked Koch to issue an official check from BOk. Koch caused BOk to issue an official check to cover Carson's $350,000 check the morning of May 18, 2000. Without Johnson's down payment check, Carson would not have had sufficient funds in his BOk checking account to cover the check he wrote to Johnson. Koch testified that "the [$350,000] deposit had been made" in Carson's account on May 18 by the time the official check was issued. Dkt. # 57, at 39. Koch also testified that once he saw that Johnson and Carson were trading checks, he called John Anderson at BOk to tell him that there was not any actual money changing hands, and that Anderson told him to go ahead with the loan. Anderson did not recall such a conversation. Koch wrote a memorandum to Anderson concerning the loan on July 20, 2000. The memorandum did not mention the trading of checks.

**II.**

"[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "A defendant

5

may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict . . . ." Fed. R. Crim. P. 29(c)(1). In reviewing the sufficiency of the evidence, a court asks

> whether, viewing the evidence in the light most favorable to the government as the prevailing party, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In so doing, we do not weigh evidence or credibility; we ask instead only whether the government's evidence, credited as true, suffices to establish the elements of the crime. While this standard of review is deferential, it is not decrepit. We will not, for example, uphold a conviction "obtained by piling inference upon inference, and the evidence supporting a conviction must do more than raise a mere suspicion of guilt."

United States v. Hutchinson, 573 F.3d 1011, 1033 (10th Cir. 2009) (quoting United States v. Rakes, 510 F.3d 1280, 1284 (10th Cir. 2007)).

### III.

Koch argues that there is insufficient evidence to support his conspiracy conviction because there is no evidence he knew of any false representations to BOk. Dkt. # 60, at 8. In order to convict a defendant of conspiracy in violation of 18 U.S.C. § 371, the government must prove beyond a reasonable doubt that: the defendant agreed with at least one other person to violate the law; one of the conspirators engaged in at least one overt act furthering the conspiracy's objective; the defendant knew the essential objective of the conspiracy; the defendant knowingly and voluntarily participated; and there was interdependence among the members of the conspiracy. 10TH CIR. CRIM. JURY INSTR. 2.19 (2006); see also United States v. Rahseparian, 231 F.3d 1267, 1272 (10th Cir. 2000).

> 'The core of a conspiracy is an agreement to commit an unlawful act.' '[T]he critical inquiry is whether the circumstances, acts, and conduct of the parties are of such a character that the minds of reasonable men may conclude therefrom that an unlawful agreement exists.' The existence of the agreement to violate the law may be inferred from a 'unity of purpose or common design and understanding' among conspirators to accomplish the objects of the conspiracy.

6

United States v. Weidner, 437 F.3d 1023, 1033 (10th Cir. 2006) (internal quotations omitted). The elements of a § 1344(2) violation are: the defendant or a co-conspirator knowingly executed a scheme or artifice to obtain money or property from a federally insured institution by means of false or fraudulent pretenses, representations, or promises; the institution was a financial institution within the meaning of the law; the defendant or co-conspirator acted with intent to defraud; and the false or fraudulent pretenses, representations, or promises that the defendant made were material. 10TH CIR. CRIM. JURY INSTR. 2.58 (2006). If a defendant or co-conspirator "knowingly provided materially false information in order to induce [a] loan, the crime is complete." United States v. Hollis, 971 F.2d 1441, 1452 (10th Cir. 1992). The jury found that Koch joined a conspiracy, the essential objective of which was to execute a scheme or artifice to obtain moneys under the custody and control of a federally insured banking institution, in violation of 18 U.S.C. § 1344(2). Koch argues that there is no evidence that he knew of Johnson and Carson's underlying fraud. Dkt. # 60, at 10.

Johnson testified that Koch knew that Johnson and Carson agreed to swap checks, and that Koch encouraged Johnson to go through with the check swap in order to get the loan closed. Johnson testified that Koch assured him that "it would work," and that he did not want to know anything about swapping checks. Johnson testified that he repeatedly told Koch that he did not have the cash to make the down payment. A rational trier of fact could have inferred that Koch knew that Johnson did not have the means to make the down payment, whether in cash or in stock. Johnson testified that Carson suggested loaning Johnson the money or swapping checks after Koch told them the stock assignment would not work. Notably, there was no testimony that Carson offered to purchase the stock in cash. If Koch knew this, he knew that no down payment was going to be made

and, further, that Johnson was not loan-worthy because he did not have the necessary assets. Thus, a rational jury could have found that Koch knew that the real arrangement between Johnson and Carson was not as represented in the loan documents presented to BOk. Johnson also testified that Koch asked Johnson what he was doing depositing Carson's check at the First National Bank of Grove. A rational jury could infer that Koch wanted Johnson to deposit the check at BOk so that the check swap would not be detected. Anderson did not recall Koch ever having reported the check kite to him, and Koch's memorandum to Anderson did not mention the check swap. A rational jury could find that Koch deliberately withheld this information from Anderson and BOk.

There was sufficient evidence from which a rational factfinder could find that Koch knowingly and voluntarily agreed with Johnson and Carson to make it appear that a down payment was being made on the marina when, in fact, no money was changing hands. There is sufficient evidence from which one could find that Koch knowingly and voluntarily agreed with Johnson and Carson to cause BOk to make a loan for which Koch knew Johnson was not qualified. There is sufficient evidence from which one could find that Koch knew that the actual circumstances of the transaction were different than the arrangement presented in the loan documentation. It does not matter that Koch did not personally make the false representations as part of the scheme to obtain the loan. Johnson's false representations became attributable to Koch once he joined the conspiracy. See United States v. Cherry, 217 F.3d 811, 817 (10th Cir. 2000); see also Pinkerton v. United States, 328 U.S. 640 (1946). This is sufficient to support Koch's conspiracy conviction.

Koch also argues that a scheme to kite checks is not unlawful under 18 U.S.C. § 1344(2) and, thus, that the object of the conspiracy was not unlawful. In Williams v. United States, 458 U.S. 279, 284 (1982), the Supreme Court held that the deposit of a check backed by insufficient funds was not

a false statement because "technically speaking, a check is not a factual statement at all, and therefore cannot be characterized as 'true' or 'false.'" Applying Williams, the Tenth Circuit stated in United States v. Bonnett, 877 F.2d 1450, 1456 (10th Cir. 1989), that "a criminally prohibited statement or representation cannot be formed from an implied representation that the maker of a check will have sufficient funds to pay the check upon presentment." The defendants in Bonnett had presented a series of worthless checks in order to inflate a customer's bank account balance and allow Bonnett, a bank employee, to exceed his bank's lending limit. Id. at 1453. Even though it found that the checks themselves could not constitute a misrepresentation, the Tenth Circuit held that there was sufficient evidence to sustain Bonnett's conviction under § 1344(2) because "the defendants by their conduct used the checks as if sufficient funds existed . . . to pay those checks upon presentment, and thus purposely produced the false impression necessary to artificially inflate Mr. Bonnett's bank balances upon the books of Bank." Id. at 1456-57. Thus, it was the conduct associated with the check kite, not the checks themselves, that constituted the false or fraudulent pretenses, representations, or promises.

The check kite was not the object of the scheme in this case; the object of the scheme was to obtain the loan. The false or fraudulent pretenses included the false loan documents and representations that a down payment would be and had been made on the marina. In addition to the false representations and pretenses of which he was aware, Koch became liable for the acts of his co-conspirators once he joined the conspiracy. See Cherry, 217 F.3d at 817. The check kite was merely part of this scheme.

9

**IT IS THEREFORE ORDERED** that Defendant Larry G. Koch's Motion for Judgment of Acquittal (Dkt. # 60) is **denied**.

**IT IS SO ORDERED** this 12th day of July, 2010.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT